IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-01071-LTB

JEAN HABEGGER McALEER,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

Plaintiff, Jean McAleer, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and her application for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I REVERSE and REMAND the Commissioner's final order for further proceedings.

## I.    STATEMENT OF THE CASE

Plaintiff seeks judicial review of SSA's decision denying her applications for disability insurance benefits and for supplemental security income. Compl., ECF

No. 1. The applications were initially denied on August 22, 2013. [Administrative Record ("AR") 20] The Administrative Law Judge ("ALJ") conducted an evidentiary hearing on September 22, 2015 and issued a written ruling on October 8, 2015. [AR 17–31] In that ruling, the ALJ denied Plaintiff's application on the basis that she was not disabled because she had the residual functional capacity to perform her past relevant work. [AR 30–31] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making SSA's denial final for the purpose of judicial review. [AR 1] *See* 20 C.F.R. §416.1481. Plaintiff timely filed her complaint with this court seeking review of SSA's final decision.

## II.  FACTS

### A.  Background

Plaintiff is a 40 year-old woman who has a Bachelor of Arts in English. [AR 791] She has held a variety of jobs, including editor, program administration, apartment manager, personal assistant, and online researcher. [AR 92, 791] Plaintiff alleged she became disabled on March 31, 2010 due to a variety of conditions; most prominently at issue is the condition ankylosing spondylitis. [AR 82]

Ankylosing spondylitis is a form of chronic arthritis that affects the spine. Ankylosing spondylitis, *Genetics Home Reference*, Nat'l Inst. Health, https://ghr.nlm.nih.gov/condition/ankylosing-spondylitis (last visited May 16, 2018). Early symptoms of ankylosing spondylitis include sacroilitis, which is the inflammation of the sacroiliac joints—the joints between the pelvic bone and the

base of the spine. *Id.* This can eventually cause spondylitis if the inflammation spreads to the joints between the vertebrae. *Id.* Ankylosing spondylitis falls under the umbrella term seronegative spondyloarthropathy, referring to "a group of connective tissue diseases that cause prominent joint inflammation." Spondyloarthritis, *Merck Manual*, https://www.merckmanuals.com/home/bone,‐joint,‐and‐muscle‐disorders/joint‐disorders/spondyloarthritis (last visited May 16, 2018).

### B. Relevant Medical History

Plaintiff began to see Barbara Drevlow, M.D., a specialist in rheumatology located in Illinois, in 2005 where she "presented with pain, swelling and stiffness in her joints including her sacroiliac joints accompanied by fatigue [and] muscle aches." [AR 1201] Dr. Drevlow determined the findings of Plaintiff's evaluation were consistent with ankylosing spondylitis and seronegative spondyloarthropathy. [*Id.*] Dr. Drevlow noted that Plaintiff worked 15 hours a week in an office setting in 2005, but by early 2010, she was unable to work. [*Id.*] Plaintiff continued to see Dr. Drevlow until 2014 and was continually assessed with sacroilitis, seronegative arthritis, and a family history of ankylosing spondylitis. [AR 711, 714, 717, 719, 722, 725, 728, 731, 733, 736, 739, 741, 743, 745, 1090, 1094, 1096–97, 1101, 1104, 1109, 1126, 1133, 1137, 1147] Sheila Bhagavan, M.D. noted that Plaintiff was diagnosed with ankylosing spondylitis when she was 25 and began Humira in 2008. [AR 629] Humira is used to treat ankylosing spondylitis among other maladies. *See* Humira, *DailyMed*, Nat'l Inst. Health, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=608d4f0d‐b19f‐46d3‐

749a-7159aa5f933d (last visited May 18, 2018).

Plaintiff additionally was "found to have lumbrosacral [sic] spine degenerative joint and disc disease" which was treated with physical therapy, pain medications, and epidural steroid injections. [AR 1201]

Dr. Drevlow treated Plaintiff's ankylosing spondylitis and seronegative spondyloarthropathy with "nonsteroidal anti-inflammatory agents, methotrexate and TNF inhibitors with fair response." [AR 1201] These injections, including Humira, were a constant throughout Dr. Drevlow's treatment plan for Plaintiff. [*E.g.* AR 709, 721, 740, 935] At first, these injections would alleviate pain and she would state that she is doing better or feeling well, but after the injections wore off she would feel sore. [AR 730, 735, 738, 740, 742, 744] As time progressed, Plaintiff experienced more pain in the neck, wrist, hands, lower back, buttocks, ankles, and feet. [AR 709, 712, 718, 721, 727, 929, 933, 1095, 1099] Dr. Drevlow and Plaintiff discussed whether the injection drug Humira was working or if something else should be used. [AR 735, 929] Plaintiff stated that she felt her "joints are pulsing with pain at times." [AR 715] She experienced infections due to some of the injections. [AR 712, 721, 1102, 1108]

During her time seeing Dr. Drevlow, Plaintiff also began to see Daniel Hurley, M.D. Dr. Hurley noted in his first appointment with Plaintiff that she presented with low back pain and bilateral leg pain that had affected her for about ten years. [AR 516] He noted that she had tried many medications and was found to have ankylosing spondylitis by sudden onset of multi-joint pain and based on family

4

history. [*Id.*] He noted that Plaintiff was on "triple meds for the [ankylosing spondylitis]" and that it was still a challenge to control. [AR 516–518]

Dr. Hurley referred Plaintiff to Shaun O'Leary, M.D. to primarily deal with pain related to meralgia paresthetica, which is compression of the nerve that supplies sensation to the skin surface of the thigh. [AR 804]; Meralgia paresthetica, *Mayo Clinic*, https://www.mayoclinic.org/diseases-conditions/meralgia-paresthetica/symptoms-causes/syc-20355635 (last visited May 17, 2018). Dr. O'Leary and Plaintiff discussed a percutaneous peripheral nerve stimulator trial, because Plaintiff had "failed all conservative care." [AR 816] While Plaintiff was interested and willing to participate, this procedure did not occur because it was denied by insurance. [AR 915, 926, 929] After the denial, Dr. Drevlow noted that Plaintiff struggled with pain in her shoulders, hands, neck, hips, and back. [AR 926, 1088]

Mary Kelly, D.O. became Plaintiff's primary physician and noted Plaintiff's ankylosing spondylitis. [AR 1120] Dr. Kelly performed a physical capacity evaluation and found that Plaintiff could: (1) sit for three hours and stand or walk for one hour during an eight-hour day; (2) perform simple grasping, pushing and pulling, but not fine manipulation or repetitive motion tasks; and (3) never carry or lift any weight. [AR 1111–12]

Reynaldo Gotanco, M.D. and Vidya Madala, M.D. performed consultative exams on behalf of SSA. [AR 89–92, 105–07] Both note "known ankylosing spondylitis." [AR 90, 106] Dr. Gotanco found that Plaintiff's statements concerning

her symptoms were substantiated by the objective medical evidence, but Dr. Madala gave partial credibility. [AR 89, 105] Drs. Gotanco and Madala based their exertional limitations on the same four medical records. [AR 90, 106] Drs. Gotanco and Madala both found that Plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for two hours, sit for six hours in an eight-hour day, and could push or pull an unlimited amount. [*Id.*]

Plaintiff relocated to Colorado in 2015, where she began to see Vance J. Bray, M.D. at the Denver Arthritis Clinic. [AR 1176] Dr. Bray noted that Plaintiff had ongoing symptoms and a past medical history of ankylosing spondylitis and elevated levels of C-reactive protein "despite weekly Humira with methotrexate and meloxicam" which suggested "suboptimal efficacy." [AR 1174–76] Dr. Bray noted pain in many of Plaintiff's joints and suggested a different regime of medicine. [*Id.*]

### C. Hearing Testimony

Plaintiff's hearing occurred on September 22, 2015. [AR 40] Plaintiff explained that she lived in Denver with her husband and five year-old son. [AR 46] The ALJ questioned Plaintiff on her work history, where they discussed the type of job she worked, what it entailed, and how much physical exertion was needed. [AR 47–52] The ALJ asked Plaintiff about medications and Plaintiff noted that she was no longer doing Humira injections and instead took Remicade infusions which as a noted side effect left her tired and at times sleeping until the day after the infusion. [AR 52–54]

Plaintiff explained that three primary conditions—ankylosing spondylitis, fibromyalgia, and neuropathy—and the specific condition merlgia paresthetica kept

her from working because of extreme fatigue, pain in all her joints, and "deeper, more prolonged pain in [her] lower back, neck, shoulders, wrists, elbows, [and] hands." [AR 55–56] She continued that pain in her hips meant she had to lie down frequently, the nerve pain in her legs meant she could only stand for about ten minutes before the pain increased, and that even sitting her pain would be triggered in about 30 minutes. [AR 56] She discussed the few ways in which she would sit or lie throughout the day and that she usually would lie down from two to four hours per day because her pain increased by sitting. [AR 60]

Plaintiff discussed the actions she could do at home, consisting of unloading the dishwasher or folding laundry about once a week and preparing simple meals. [AR 56–57] She stated her husband did the "vast majority" of grocery shopping and that she used a motorized cart when she went to the store. [AR 57] She stated that she drove about five days a week, mostly taking or picking up her son from school and that she watched him alone for about one hour per day. [*Id.*] She stated that she had difficulty showering and getting dressed, but still did it every day with periods of lying down in between. [AR 59]

Plaintiff confirmed that Dr. Drevlow was the one to diagnose her with ankylosing spondylitis and fibromyalgia. [AR 62] She discussed the quality of her past jobs, her hopes of one day re-entering the job market, and that she moved to Denver for additional family support. [AR 63–64]

During examination from the ALJ, Plaintiff explained that she spent much of her time at home online, reading, or watching TV. [AR 66] Plaintiff also explained

that she did volunteer work and reduced her role, but was still a board member at the organization. [AR 72–73]

The ALJ examined the vocational expert ("VE") to categorize Plaintiff's past work and physical demand levels. [AR 68–70] The ALJ then hypothesized whether a woman with a background and constraints similar to Plaintiff's could do any of Plaintiff's past work. [AR 73–74] The VE stated that under the hypothetical, all of her relevant positions could still be performed. [AR 73–75]. The ALJ modified the hypothetical to an individual that "is further limited such that they can perform frequent but not continuous reaching and handling and fingering." [AR 74] The VE stated that all jobs would remain. [AR 74–75] The ALJ modified again to an individual who could be on her feet standing or walking a total of one hour during the day, and sitting a total of three hours during the day. [AR 75] The VE stated that this limitation would not be consistent with competitive work. [*Id.*] The VE also stated that competitive work would be eliminated if the individual had poor capacity to interact with the public and maintain attention or concentration. [*Id.*]

Plaintiff's representative then asked the VE a few other hypotheticals. [AR 75–77] The VE stated there would not be work for someone with Plaintiff's age, education, and past relevant work if that person: (1) needed to lie down for two hours a day; (2) had to elevate her legs at waist-level for at least an hour a day; or (3) would need up to five bathroom breaks in the first three hours of work in a day. [AR 75–76] The VE also confirmed that any of the jobs described by the ALJ would not be performable if there was need for "occasional use of the handling, fingering,

and fine manipulation . . . ." [AR 76]

## III.   LEGAL STANDARDS

### A. SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under Title II of the Social Security Act if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established a five-step sequential evaluation for determining whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." If she is, benefits are denied and the inquiry stops. 20 C.F.R. § 404.1520(b). At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If she does not, benefits are denied and the inquiry stops. If she does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity

("RFC")—that is, what she is still able to do despite her impairments—and asks whether the claimant can do any of her "past relevant work" given that RFC. 20 C.F.R. § 404.1520(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience. 20 C.F.R. § 404.1520(g). At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2.

In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).

### B. Standard of Review

My review concerns only whether SSA's factual findings are supported by substantial evidence and whether the correct legal standards were applied. *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015). With regard to the law, reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Kellams v. Berryhill*, 696 F. App'x 909, 911 (10th Cir. 2017). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is more than a mere scintilla and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Razo v. Colvin*, 663 F. App'x 710, 713 (10th Cir. 2016). The record must demonstrate

that the ALJ considered all of the evidence, but an ALJ is not required to discuss

every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I

examine the record as a whole and may not reweigh the evidence or substitute my

judgment for that of the ALJ. *Razo*, 663 F. App'x at 713.

## IV.    THE ALJ'S RULING

In his ruling, the ALJ concluded that Plaintiff was not disabled at the fourth

step of SSA's sequential process. [AR 30–31]  In so doing, the ALJ first found that

Plaintiff had not engaged in substation gainful activity since her alleged onset date

of March 31, 2010 through her date of last insured on December 31, 2014, fulfilling

step one. [AR 22] In step two, the ALJ determined that Plaintiff had the "following

severe combination of impairments: ankylosing spondylitis, fibromyalgia, sleep

apnea, asthma, thyroid disorder, polycystic ovary, meralgia paresthetica, and

obesity." [AR 22]  However, the ALJ concluded in step three that these impairments

did not meet or medically equal a listed impairment deemed to be so severe as to

preclude substantial gainful employment. [AR 24]

The ALJ determined that Plaintiff had the RFC to lift or carry 20 pounds

occasionally and 10 pounds frequently; sit approximately six hours and stand or

walk two hours per day; occasionally stoop, kneel, crouch, and use stairs and

ladders, ropes, or scaffolds; frequently reach, handle, and finger; and should avoid

concentrated exposure to cold, heat, humidity, dust, fumes, odors, and gases. [AR

24–25] The ALJ found this by considering opinion evidence and "all symptoms and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence." [AR 25] The ALJ stated that the combination of Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. . . ." [*Id.*] In this, the ALJ reviewed Plaintiff's claims about her symptoms and conditions. [AR 25–27] The ALJ discounted opinions by Drs. Drevlow and Kelly because he found their opinions were not in accordance with findings in the record. [AR 27–29]

Of note, the ALJ stated that "[a]lthough she reports having ankylosing spondylitis, it appears that she has a family history of this but has not actually been diagnosed with this herself. The record states the claimant's 'mother has AK' . . . [and a]lso noted is a 'family history of AK' but without any diagnosis for the claimant." [AR 27] This contradicts what the ALJ earlier notes as Plaintiff having ankylosing spondylitis. [AR 22]

The ALJ found the state agency medical consultants opinions' to be supported by the record. [AR 29] The ALJ summarized that the RFC assessment is supported "by the opinions of Doctors Cochran, Bludspeth, Gotanco, and Madala, the generally mild to moderate clinical and objective findings, the good control of [Plaintiff's] symptoms with medication, her adequate activities of daily living, including caring for her four-year old son, driving, and volunteering, and the record

as a whole." [AR 30] Drs. Cochran and Hudspeth—I believe this is to whom the ALJ is referring as "Bludspeth"—provided "Medically Determinable Impairments and Severity" reports. [AR 87–89, 103–04]

The ALJ completed the analysis in the fourth step, where he found that through "the date last insured, [Plaintiff] was capable of performing past relevant work as a volunteer coordinator, book editor, administrative assistant, and customer service clerk. This work did not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity." [*Id.*]

The ALJ concluded that since Plaintiff was capable of performing past relevant work, she was not under a disability. [AR 31]

## V. ISSUES ON APPEAL

In appealing the ALJ's decision, Plaintiff argues the ALJ erred by failing to: (1) address whether Plaintiff met the listing for inflammatory arthritis at Step Three of the disability analysis; (2) sufficiently analyze the medical evidence in assigning her an RFC; (3) properly recognize Plaintiff's diagnosis of ankylosing spondylitis; and (4) properly assign adequate weight to both treating physicians and SSA's examining doctors. Pl.'s Br., ECF No. 17 at 20–38. The discussion of the ALJ's analysis of step three and the apparent muddling of Plaintiff's diagnosis of ankylosing spondylitis are in conjunction and are thus analyzed together.

### A. The ALJ's sufficiency in analyzing whether Plaintiff met the listing for inflammatory arthritis

Plaintiff argues that the ALJ erred by failing to apply the elements of the relevant listing for inflammatory arthritis in the Code of Federal Regulations. *Id.* at

20. Plaintiff argues that the ALJ did not sufficiently determine whether Plaintiff's impairments were of a severity to meet the criteria of an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (the "Listing") as is required by the third step in SSA's five-step process. *Id.* Plaintiff contends that the ALJ did not analyze pertinent medical evidence and did not apply the elements of Listing 14.09, which concerns inflammatory arthritis. *Id.* Plaintiff argues that I should remand the case back to the ALJ to determine whether Listing 14.09 applies to her. *Id.* at 28

Defendant argues that the ALJ was reasonable in finding that none of Plaintiff's impairments met the requirements of any section in the Listing. Def.'s Resp., ECF No. 18 at 6. Defendant contends that the ALJ was reasonable because whether Plaintiff met the requirements of a specific section of the Listing was not presented to the ALJ before his decision. *Id.* Defendant further states that "[w]ith no opinion in the record supporting, and Plaintiff's counsel not alleging a finding of disabled at step three, the ALJ did not err by not discussing any specific section of the Listings." *Id.* Defendant continues that since Listing 14.09 was never directly presented to the ALJ, it would be illogical to expect him to go through the entire Listing to rule out impairments. *Id.* at 7. Defendant states that "Plaintiff might as well argue that the ALJ erred by not discussing, one-by-one, all sections of the Listings that might have possibly been implicated by her impairments, without regard to whether there was even any record support for a given Listing in the first place." *Id.*

Defendant argues that I "must affirm an ALJ's decision unless Plaintiff

shows that the evidence supports a conclusion that her impairments met all of the requirements of a specific section of the Listings." *Id*. Conversely, Defendant contends that if I do find that the ALJ erred in not sufficiently discussing the Listing requirements, that the this error would be harmless because the RFC narrative contained enough information that one could find evidence that Plaintiff did not satisfy Listing 14.09. *Id*. at 11.

1. *The effect of Plaintiff's non-attorney representative's classification*

There appears to be confusion as to the representation of Plaintiff during the hearing and the resultant effect of the classification. According to the transcript of the hearing, Plaintiff was represented by Anne Marie Mullins. [AR 42] The ALJ referred to Mullins as "counsel," she entered an appearance as such, and is noted in the transcript as Plaintiff's attorney. [AR 40, 42] However, Mullins was listed as Plaintiff's non-attorney representative in an "Appointment of Representation" signed by Mullins and Plaintiff before the hearing and was listed as a non-attorney in Plaintiff's request for review of the hearing decision. [AR 14, 79] Adding to potential confusion, the ALJ stated that "Karen Fick, a non-attorney representative" represented Plaintiff. [AR 20] Neither party mentions this person, but Karen Fick is copied to the same address as Mullins in notices from SSA and signed a form on behalf of Plaintiff objecting to appearing by video teleconference. [AR 3, 6, 19, 81]

Defendant cites to *Branum v. Barnhart* for the proposition that in cases "where the claimant was represented by counsel at the hearing before the ALJ, 'the

ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.'" ECF No. 18 at 6; 385 F.3d 1268, 1271 (10th Cir. 2004) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)). However, Defendant does not provide additional evidence from the record on this issue. Based on the Appointment of Representation form signed by both Mullins and Plaintiff, I will proceed as if Mullins represented Plaintiff as a non-attorney.

Under that guise, the ALJ has a heightened duty of inquiry to develop the record when a claimant is not represented by counsel. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006) (citing cases). Additionally, "because a social security disability hearing is a nonadversarial proceeding, the ALJ is responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Id.* (citing cases) (quotations omitted); *see* 20 C.F.R. § 404.944 (requiring the ALJ to look "fully into the issues"). Taking the contrapositive of the proposition presented in *Branum*, since Plaintiff was not represented by counsel, the ALJ was not entitled to rely upon Plaintiff's argument on its own.

### 2. *The ALJ's discussion of Listing 14.09*

At step three, the ALJ must determine whether Plaintiff's impairment is equivalent to an impairment in the Listing. *Peck v. Barnhart*, 214 F. App'x 730, 733 (10th Cir. 2006). Plaintiff has the burden to present evidence establishing that her impairments meet or equal impairments in the Listing. *Id.* (quoting *Fischer-Ross v.*

*Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005)). To satisfy this burden, Plaintiff must establish that her impairment meets "all of the specified medical criteria. An impairment that manifests only some ... criteria, no matter how severely, does not qualify." *Id.* (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

The ALJ may not summarily conclude that Plaintiff's impairments do not meet an impairment in the Listing. *Clifton*, 79 F.3d at 1009. The ALJ is required to discuss the evidence and explain why he finds that Plaintiff is not disabled at step three. *Id.* (citing cases).

In *Clifton*, the court reversed the district court's affirmation of SSA's denial of appellant's application for Social Security benefits. *Id.* at 1008–09. In pertinent part, appellant appealed the confirmation by the district court that his impairments did not meet a specific impairment in the Listing. *Id.* The court reversed because "the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment." *Id.* at 1009. The court explained that "[s]uch a bare conclusion is beyond meaningful judicial review." *Id.* The court looked to 42 U.S.C. § 405 which reads that

> [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it

is based.

The court explained that "[b]y congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration." *Clifton*, 79 F.3d at 1009 (citing cases). While the court noted that the ALJ is not required to discuss every piece of evidence, it concluded that "[i]n the absence of ALJ findings supported by specific weighing of the evidence, [the court] cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion." *Id.* The court remanded the case "for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three." *Id.* at 1010.

A similar finding and analysis occurred in *Peck v. Barnhart*, where an ALJ's failure to discuss the Listing for a specific impairment or the ALJ's reasons for rejecting its applicability required remand to determine whether appellant met the requirements of the Listing. 214 F. App'x at 734–35. In *Peck*, SSA argued that the case should not be remanded because there was no evidence that appellant met the definition of a specific impairment in the Listing. *Id.* at 736. To this, the court stated that SSA's "argument ignores [the court's] ruling in Clifton where [it] held that [it] can only review ALJ decisions that make specific findings on the facts of the case." *Id.* (citing *Clifton*, 79 F.3d at 1009–10). The court stated that if appellant did not meet the specific impairment's definition in the Listing, "then the ALJ must

make that determination in the first instance." *Id.*

SSA's arguments in the current case feature the same deficiencies that necessitated remand that the Tenth Circuit found in in *Peck* and *Clifton*. Here, in finding that Plaintiff's severe impairments did not equal an impairment in the Listing, the ALJ stated that

> [t]he medical records indicate that no State agency physicians concluded that the claimant's impairments meet or equal a listing. In addition, no consultative examiner concluded that a listing is met or equaled and no treating or examining physician suggested that the claimant's impairments meet or equal a listing. The claimant's representative has not suggested that any listing is met or equaled.

[AR 24]

Plaintiff's numerous diagnoses of ankylosing spondylitis, including the ALJ's recognition that Plaintiff had ankylosing spondylitis, noted *supra*, necessitate the ALJ's analysis of Listing 14.09, which directly implicates ankylosing spondylitis. *See* Ankylosing spondylitis, *Genetics Home Reference*, Nat'l Inst. Health, https://ghr.nlm.nih.gov/condition/ankylosing-spondylitis (last visited May 16, 2018) ("[A]nkylosing spondylitis is a form of ongoing joint inflammation (chronic inflammatory arthritis).").

Additionally, the ALJ contradicted himself concerning whether Plaintiff had been diagnosed with ankylosing spondylitis. Noted *supra*, in one part of his order, he stated that Plaintiff had ankylosing spondylitis and later in the order, he stated that although Plaintiff reported having ankylosing spondylitis, "it appears that she a family history of this but has not actually been diagnosed with this herself." [AR 22, 27]

Defendant acknowledges this mistake and concedes that Plaintiff should be considered as diagnosed with ankylosing spondylitis. ECF No. 18 at 13. Defendant contends that "[o]ther than arguing that the ALJ misunderstood the record[], Plaintiff does not claim the error affected the decision in any way" and thus the argument is waived. *Id.*

However, in full, Plaintiff states that "[t]he ALJ's finding is conclusive proof that he misunderstood the record evidence. An erroneous finding on such a critical factual issue by the sole fact finder can never be said to be harmless error. By necessity, it had to taint the ALJ's entire view of the case." ECF No. 17 at 34.

Whether the mistake truly tainted the ALJ's view of the entire case is unknown, but what is known is that this error was not harmless. *See Smith v. Barnhart*, 172 F. App'x 795, 801 (10th Cir. 2006) (holding that the ALJ's failure to specifically address the Listing is reversible error because the court "cannot engage in meaningful judicial review.").

This is not a situation such as that in *Fischer-Ross*, where the court found that the explanations and analysis provided in steps four and five properly supported what would otherwise have been an insufficient explanation in step three. 431 F.3d at 732–35; *see Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008) (holding that an ALJ's error is not harmless if he or she fails to discuss a Listing and the findings elsewhere in his or her decision are inadequate to unambiguously negate a plaintiff's claim to satisfy the elements of that Listing).

However, I will not go as far as Plaintiff suggests in stating that because of

the National Institute of Health's definition of ankylosing spondylitis as "a form of progressive arthritis due to chronic inflammation of the joints in the spine," that a diagnosis of ankylosing spondylitis necessarily satisfies the requirements of Listing 14.09. ECF No. 17 at 23. If that was the case, SSA would not have had reason to add the additional requirements besides ankylosing spondylitis to Listing 14.09(C):

> Ankylosing spondylitis or other spondyloarthropathies, with:
>
> 1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or
>
> 2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.09, subdiv. C. Plaintiff additionally states that ankylosing spondylitis and seronegative spondyloarthropathy are "specifically addressed in 42.09(C)," but I cannot find additional information or citations to know to what this is referring. ECF No. 17 at 23.

Taken as a whole, the ALJ did not make specific findings as to Listing 14.09 which was, in the least, clearly relevant based on the medical records available to the ALJ and his own findings.

Thus, I must remand on this issue because I cannot assess whether relevant evidence adequately supports the ALJ's conclusion that Plaintiff's impairments did not meet or equal any impairment in the Listing, and whether he applied the

correct legal standards to arrive at that conclusion. *See Clifton*, 79 F.3d at 1009. The ALJ must set out his specific findings, including an analysis of Listing 14.09, and his reasons for accepting or rejecting evidence at step three.

### B. The ALJ's analysis of Plaintiff's RFC

Plaintiff argues that the ALJ did not provide sufficient explanation for assigning Plaintiff an RFC that included no limitation on the use of Plaintiff's hands or for mentioning any of the evidence provided concerning the limitations of Plaintiff's hands and fingers. ECF No. 17 at 30. To prove that the ALJ failed to provide substantial evidence in his assignment of Plaintiff's RFC, Plaintiff cites a variety of instances in the administrative record that were not discussed by the ALJ and for which the ALJ provides no explanation for rejecting in his decision. *Id.* at 29–31. Plaintiff alleges that since the ALJ did not discuss or follow the pertinent medical evidence, the RFC he provided to the VE was flawed, which then tainted the VE's determination that Plaintiff could perform her past relevant work. *Id.* at 32.

In her Reply, Plaintiff additionally states that the ALJ's misunderstanding and confusion surrounding Plaintiff's diagnosis of ankylosing spondylitis is *prima facie* proof that there was not substantial evidence surrounding his opinion "such that he could not objectively understand and analyze the medical and testimonial evidence before him." Pl.'s Reply, ECF No. 21 at 10–11. While this argument was made in the context of the ALJ's apportionment of weight to specific examiners, discussed *infra*, the argument applies here as well.

Defendant argues in response that Plaintiff "misapprehended" the ALJ's

decision and that the ALJ found that "Plaintiff was able to frequently (not constantly) reach, handle, and finger." ECF No. 18 at 11. Defendant then looks to the administrative record and finds evidence that "tends to support the ALJ's conclusion." *Id.*

In assigning the RFC, the ALJ acknowledged Plaintiff's allegations that she: (1) "experiences tingling and weakness in her hands," (2) has "difficulty doing things that require repetitive use of her hands that require fine motor skills, and reported that she occasionally struggles with gripping and grasping things;" and (3) has trouble grasping and lifting items in everyday life. [AR 25–26]

The ALJ ruled that Plaintiff "has 'severe' impairments that limit her to performing no more than a range of sedentary to light exertion work, but the record does not support the alleged severity of [Plaintiff's] symptoms/limitations, including . . . only occasionally perform[ing] handling and fingering." [AR 27]

The ALJ discussed Dr. Drevlow's extensive records and found that these records did not fully support Drs. Drevlow and Kelly's opinions. [AR 28] While the ALJ examination cited to Plaintiff's medical records numerous times, he seemed to not speak much to Plaintiff's use of her hands. He stated that: (1) Plaintiff was "apparently very active hosting and cooking for two large gatherings, suggesting greater than functional capacity than has been alleged . . . ;" (2) Plaintiff "was able to shop for an hour and handle an aquatics exercise class;" and (3) "Dr. Drevlow noted that [Plaintiff] retained fair to good grip strength and indicated [her] pain would interfere with skilled but not unskilled work." [*Id.*]

Plaintiff points to instances in the record where Dr. Drevlow spoke specifically about Plaintiff's hands and that the ALJ did not discuss. ECF No. 17 at 30–31; [AR 545–46, 926, 1113, 1175] For example, Dr. Drevlow stated that Plaintiff's "hands are worse. They are more stiff and more painful. This is worse in the morning and all through the day. This is starting to interrupt her sleep." [AR 926]

In the report where the ALJ highlighted that Plaintiff has been active hosting dinners, it is noted that Plaintiff has known ankylosing spondylitis. [AR 502–03] The ALJ stated that Plaintiff does not have ankylosing spondylitis (at least in one part of his opinion), but then relied on a medical report that specifically stated she does have ankylosing spondylitis for a proposition adverse to Plaintiff concerning functional capacity. [AR 27, 28, 502–03] This leads me to believe that either the ALJ was confused on the diagnosis or selectively chose evidence to find a lack of disability from the record, neither of which leads to harmless error in this circumstance. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

Therefore, I remand on this issue. The ALJ must determine with sufficient evidentiary support whether he finds Plaintiff to have ankylosing spondylitis and then must reformulate his RFC opinion accordingly.

## C. The ALJ's apportionment of weight to treating physicians

Plaintiff argues that the ALJ did not give appropriate weight to Drs. Drevlow and Kelly. ECF No. 17 at 35. Plaintiff states that the ALJ failed to address Dr.

Drevlow's opinions from 2013 and 2014, the length and frequency of the treating relationship, her speciality, and disputes the ALJ's finding that Drs. Drevlow and Kelly's opinions were inconsistent with the record. *Id.* at 36. Plaintiff further disputes the weight given to the consulting examiners' opinions due to deficiencies in the evidence they relied upon and lack of sufficient explanation in their opinions. *Id.* at 37–38.

Defendant responds that the ALJ was reasonable in according little weight to Drs. Drevlow and Kelly because their opinions "were inconsistent with the evidence in the record as a whole, including their own treatment notes." ECF No. 18 at 13. Defendant generally argues that Plaintiff is asking me to reweigh the evidence and that since Plaintiff does not challenge the ALJ's finding that the opinions of both the treating physicians and the consulting examiners were supported by the record as a whole, these arguments are waived. *Id.* 14–15.

The initial determination the ALJ must make, with respect to a treating physician's medical opinion, is whether it is to be accorded "controlling weight," on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Such an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record. *Id.* (quoting SSR 96–2p); see also 20 C.F.R. §404.1527(d)(2); *Doyal*, 331 F.3d at 762 (a "treating physician's opinion is given particular weight because of his [or her] unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").

Even if a treating opinion is not given controlling weight, it is still entitled to deference. The ALJ must make clear how much weight the treating opinion is being given (including whether it is being rejected outright) and then give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned. *Watkins*, 350 F.3d at 1300–01. Those specific factors, listed in 20 C.F.R. § 404.1527, include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 n.7 (10th Cir. 2004). While the ALJ need not explicitly discuss each individual factor, see *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), the ALJ must "give good reasons in the notice of determination or decision for the weight he [or she] ultimately assigns the opinion." *Watkins*, 350 F.3d at 1301.

The opinions of treating physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of consulting physicians or those who only review the record and do

not examine the claimant. *Robinson*, 366 F.3d at 1084. "In choosing to reject [a] treating physician's assessment, an ALJ may not make speculative references from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* at 1082.

Here, similar deficiencies arise as in the other issues stated on appeal. The ALJ gave lengthy reasoning for why he accorded only minimal weight to Drs. Drevlow and Kelly's opinions. [AR 26–29] He made specific cites to the administrative record, pointing out places where Dr. Drevlow's findings contradict her own opinion letter, which was submitted after the hearing. [AR 28–29, 1201] The ALJ wrote that he "considered [Dr. Drevlow's] opinion but gives it little weight in light of [Plaintiff's] adequate activities of daily living (including driving and volunteering), and also the well-supported opinions from Drs. Cochran and Hudspeth." [AR 28–29] He also detailed, albeit less extensively, why he gave great weight to the opinions of the State medical examiners, Drs. Gotanco and Madala. [AR 29–30]

The issue arises when looking at the opinions upon which the ALJ relied. Under the prompt to "[e]xplain exertional limitations and how and why the evidence supports your conclusions" the opinions of Drs. Gotanco and Madala state that Plaintiff has "known ankylosing spondylitis." [AR 90, 106] Further, even though the ALJ cites to Dr. Drevlow's medical records in analyzing his perceived discrepancy between Dr. Drevlow's opinion and the medical records (including her

own medical records), the fact still remains that he misinterpreted the paramount diagnosis of Dr. Drevlow's, which indeed calls into question whether his opinion is supported by substantial evidence.

When the ALJ wrote that the record states that Plaintiff's "mother has AK," on the same page, it reads that Plaintiff is a "32 year-old female who presents with a history of ankylosing spondylitis." [AR 27, 397]; *see Moore v. Barnhart,* 114 F. App'x 983, 994 (10th Cir. 2004) (holding that the ALJ's weighing of treating physician's opinion was not supported by substantial evidence when the ALJ, *inter alia*, mischaracterized the treating physician's impressions); *see also Priest v. Barnhart,* 302 F. Supp. 2d 1205, 1217 (D. Kan. 2004) (holding that the ALJ's decision was not supported by substantial evidence when the ALJ misunderstood a treating process and selectively analyzed medical evidence).

Thus, I must remand on this issue. The ALJ must determine with sufficient evidentiary support whether he finds Plaintiff to have ankylosing spondylitis and then must reformulate the weight he gives to the treating physicians and the consultative examiners.

## VI. CONCLUSION

For the above reasons, SSA's decision is REVERSED, and this case is REMANDED for proceedings consistent with this opinion. The ALJ must first set out his specific findings, including an analysis of Listing 14.09, and his reasons for accepting or rejecting evidence at step three. If a disability equalling that of any Listing is not found, the ALJ must still determine with sufficient evidentiary

support whether he finds Plaintiff to have ankylosing spondylitis, even if it does not meet an impairment in the Listing. Then, the ALJ must reformulate his RFC opinion and the weight given to physician and examiner opinions accordingly.

Dated: May 25, 2018, in Denver, Colorado.

BY THE COURT:

s/  Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE